IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

JOSEPH SAVERI LAW FIRM, INC, *et al.*   *

    Plaintiffs                *

v.                                *     Civil Action No. 1:17-cv-01603-RDB

MICHAEL E. CRIDEN, P.A.      *

    Defendant             *

## DEFENDANT'S ANSWER TO COMPLAINT AND COUNTERCLAIM

Defendant, Michael E. Criden, P.A., d/b/a Criden & Love, P.A. ("Criden & Love"), hereby files its Answer and Counterclaim.

## ANSWER TO COMPLAINT

### The Parties

1.    Criden & Love admits that Joseph Saveri Law Firm, Inc. ("Saveri Law Firm") purports to be a California corporation with its principal place of business in San Francisco, but Criden & Love is without knowledge as to these allegations, and therefore, denies same.

2.    Criden & Love admits that Joseph R. Saveri ("Saveri") purports to be a California citizen and resident of San Francisco, but Criden & Love is without knowledge as to these allegations, and therefore, denies same. Criden & Love admits that Saveri engages in the practice of law but is without knowledge whether he is an attorney in good standing of the State Bar of California, and therefore, denies same. Criden & Love further admits that Saveri filed a *pro hac*

1

*vice* motion on behalf of Isaac Industries, Inc. ("Isaac Industries") in *In re Titanium Dioxide Antitrust Litigation*, 10-cv-00318-RDB ("TIO2 Action").

3.        Criden & Love admits that Michael E. Criden, P.A. is a Florida professional association doing business as Criden & Love. Criden & Love also admits that it is a law firm with its principal place of business in South Miami, Florida.


### Jurisdiction and Venue

4.        Paragraph 4 contains a jurisdictional characterization of this lawsuit. Criden & Love admits that this Court may exercise diversity jurisdiction over this action. Criden & Love denies that the Court possesses ancillary federal jurisdiction over this dispute.

5.        Paragraph 5 contains a jurisdictional characterization of this lawsuit. Criden & Love admits this Court possesses personal jurisdiction over it. Criden & Love admits that it was class counsel in the TIO2 Action, and received attorney fees in the action, but denies the remainder of the allegations in this paragraph.

6.        Criden & Love admits that it has never raised the issue of Saveri's failure to pay Criden & Love a referral fee before the Court. Criden & Love denies that it was required to raise the issue with the Court in the TIO2 Action.

7.        Criden & Love admits that the Order Granting Motion for An Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Awards to the Class Representatives was entered by the Court on December 13, 2013, and states that the document speaks for itself.

8.        Criden & Love admits that its attorneys were granted *pro hac vice* admission by

the Court in the TIO2 Action, and like Saveri, agreed to be subject to the disciplinary jurisdiction of the Court.

9.     Criden & Love denies that venue is proper in this Court under 28 U.S.C. § 1391(b)(2), or under any order of this Court, or by virtue of its appearance in the TIO2 Action. Criden & Love denies the remainder of the allegations.

## Facts Giving Rise to the Claim

10.    Criden & Love admits that Saveri purported to be a partner with Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") who specialized in representing plaintiffs in class actions arising under federal and state antitrust laws, but Criden & Love is without knowledge as to these allegations, and therefore, denies same.

11.    Criden & Love admits that on February 8, 2010, it sent Lieff Cabraser an e-mail proposing a referral of Isaac Industries to Lieff Cabraser in exchange for a 12.5% referral fee in the TIO2 Action, and that on the same day, Lieff Cabraser sent an e-mail back to Criden & Love accepting the referral. Criden & Love states the referral agreement speaks for itself and denies the remaining allegations.

12.    Criden & Love denies the allegations in this paragraph.

13.    Criden & Love admits that on or about February 9, 2010, Haley Paint Company filed a complaint in the United States District Court for the District of Maryland, alleging a conspiracy to fix prices of titanium dioxide in violation of the antitrust laws.

14.    Criden & Love admits that on or about February 12, 2010, Isaac Industries filed a complaint in the United States District Court for the District of Maryland, alleging a conspiracy

to fix prices of titanium dioxide in violation of the antitrust laws. Criden & Love further admits that Saveri was listed on the complaint as counsel for Isaac Industries, and that he later filed a *pro hac vice* motion as counsel for Isaac Industries. Criden & Love further admits that Lieff Cabraser was appointed a lead counsel in the TIO2 Action, and Saveri functioned as the senior lawyer at Lieff Cabraser regarding the TIO2 Action.

15. Criden & Love admits that Kevin Love filed a motion for admission *pro hac vice* on April 27, 2010, and that in the motion, Kevin Love stated that he was familiar with the Code of Professional Responsibility and that he would be subject to the disciplinary jurisdiction of the Court. Criden & Love further states that the motion speaks for itself.

16. Criden & Love is without knowledge as to the exact date that Saveri withdrew as a partner of Lieff Cabraser, and therefore, denies same. Criden & Love admits that Kevin Love had a conversation in May 2012 with Saveri wherein Saveri informed Love that he was leaving Lieff Cabraser to start his own law firm and that he intended to file a motion to be appointed Lead Counsel in the TIO2 Action while representing Isaac Industries. Criden & Love further admits that Love responded to Saveri that if he moved for Lead Counsel while representing Isaac Industries, Criden & Love would expect him to pay Criden & Love a 12.5% referral fee. Criden & Love denies the remaining allegations.

17. Criden & Love admits that on July 29, 2011, the Court in the TIO2 Action entered an Order allowing East Coast Colorants LLC d/b/a Breen Color Concentrates ("Breen") to be added as a plaintiff in the TIO2 Action. Criden & Love further admits that, approximately one year later, on June 1, 2012, Saveri, who was representing Isaac Industries at the time, filed a Notice of Appearance for Breen. Criden & Love denies the remaining allegations.

4

18.    Criden & Love admits that Saveri represented Isaac Industries in the TIO2 Action from the beginning of the case until it ended because Saveri never withdrew his appearance for Isaac Industries. Because Saveri was counsel for Isaac Industries, Criden & Love further admits that, by operation of law, the Saveri Law Firm also represented Isaac Industries in the TIO2 Action. Criden & Love further admits that attorneys from the Saveri Law Firm made appearances for Isaac Industries. Criden & Love admits that Plaintiffs did not enter into a referral agreement with Isaac Industries, but instead entered into a referral fee agreement with Criden & Love. Criden & Love further admits that on July 28, 2014, Isaac Industries executed a Notice and Assent Letter, agreeing to Saveri paying a 12.5% referral fee to Criden & Love. Criden & Love denies the remainder of the allegations.

19.    Criden & Love admits that Saveri filed a motion on August 7, 2012, wherein he represented to the Court that Isaac Industries supported adding the Saveri Law Firm as a third Lead Counsel. Criden & Love also admits that, based on that motion, on August 7, 2012, the Court appointed the Saveri Law Firm as a third Lead Counsel in the TIO2 Action. Criden & Love further admits that the Saveri Law Firm became Lead Counsel while serving as counsel of record for both Isaac Industries and Breen. Criden & Love further admits that all of the work that is the subject of the present dispute was performed by the Saveri Law Firm after Saveri left Lieff Cabraser. As to the remaining allegations, Criden & Love is without knowledge, and therefore denies same.

20.    Criden & Love admits sending a reminder email to Saveri regarding his referral obligation in August 2012 and that Saveri never responded to the reminder email. Criden & Love further states that the email speaks for itself. Criden & Love denies the remainder of the

allegations.

21.    Criden & Love admits that the TIO2 Action settled for $163.5 million and that the Court awarded Class Counsel $54.5 million in attorneys' fees, and that a Final Judgment has been entered. Criden & Love admits that it consulted with Isaac Industries regarding settlements. As to the remaining allegations, Criden & Love is without knowledge, and therefore denies same.

22.    Criden & Love admits that class counsel applied for fees in the TIO2 Action and did not inform the Court of the Saveri referral fee obligation at that time. Criden & Love further admits that Saveri did not tell Criden & Love that he wasn't going to pay the referral fee until after the Court entered its order awarding attorney fees. Criden & Love denies the remainder of the allegations.

23.    Criden & Love admits that in October 2013, it sent another reminder email to Saveri regarding his referral obligation to Criden & Love. Saveri did not respond to the email. Criden & Love denies the remainder of the allegations.

24.    Criden & Love admits that a Final Judgment has been entered in the TIO2 Action and that class counsel have received fees from the TIO2 Action. Criden & Love denies the remainder of the allegations.

25.    Criden & Love admits that, in the TIO2 Action, it received approximately $1.7 million in referral fees, approximately $1 million in fees related to work it performed, and a reimbursement of expenses.

26.    Criden & Love admits that, upon information and belief, Plaintiffs have received approximately $10 million in fees related to the legal work they performed after June 1, 2012 in the TIO2 Action.

6

27. Criden & Love admits that it filed a Demand for Arbitration against Plaintiffs and that Criden & Love sought referral fees from Plaintiffs. Criden & Love also admits that the Arbitration proceeding has now been dismissed pursuant to a stipulation between the Parties.

28. Criden & Love admits that the Arbitration proceeding has now been dismissed pursuant to a stipulation between the Parties. Criden & Love further admits that Plaintiffs are not signatories to the referral agreement between Criden & Love and Lieff Cabraser. Criden & Love denies the remaining allegations.

29. Criden & Love admits that the Arbitration proceeding has now been dismissed pursuant to a stipulation between the Parties. Criden & Love admits that Plaintiffs filed objections to the Arbitration and Criden & Love responded to those objections. Criden & Love denies the remaining allegations.

30. Criden & Love admits that the Arbitration proceeding has now been dismissed pursuant to a stipulation between the Parties. Criden & Love further admits that the AAA decided that the arbitration should take place in Miami and offered the parties a list of potential arbitrators.

31. Criden & Love admits that Plaintiffs filed a complaint in the United States District Court for the Northern District of California ("California Court") and that Criden & Love filed a motion to dismiss. Criden & Love denies the remainder of the allegations.

32. Criden & Love admits that the California Court denied the motion to dismiss. Criden & Love further admits that the Arbitration proceeding was dismissed pursuant to a stipulation between the Parties. Criden & Love denies the remainder of the allegations.

33. Criden & Love admits that the California Court granted Plaintiffs' Motion for Summary Judgment (which speaks for itself), and entered a Final Judgment in favor of Plaintiffs.

7

Criden & Love denies the remainder of the allegations.

34.     Criden & Love admits that it appealed the Final Judgment, and that on June 2, 2017, the Ninth Circuit "reversed and remanded [the Final Judgment] with instructions to dismiss" because the California Court had incorrectly held that it could exercise personal jurisdiction over Criden & Love.

35.     Criden & Love admits that after the Ninth Circuit's opinion, it tried to settle this dispute with Saveri, but was unable to do so.  Criden & Love denies the remainder of the allegations.

36.     Criden & Love admits that Plaintiffs are seeking declaratory relief, but deny the remainder of the allegations.  Criden & Love further states that the Complaint speaks for itself.

**First Claim for Relief**
**(Declaratory and Injunctive Relief: No**
**Arbitration or Other Collateral Proceeding)**

37.     To the extent that Paragraph 37 includes allegations from previous paragraphs, Criden & Love incorporates its responses to those paragraphs herein. Criden & Love further admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs.

38.     Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs.  Criden & Love further admits that Plaintiffs are not signatories to the referral agreement with Lieff Cabraser.  Criden & Love denies the remaining allegations.

39.     Criden & Love admits that Plaintiffs are not signatories to the referral agreement

with Lieff Cabraser. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

40. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. To the extent that the allegations are legal conclusions, no response is necessary. Criden & Love denies the remaining allegations.

41. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. To the extent that the allegations are legal conclusions, no response is necessary. Criden & Love denies the remaining allegations.

42. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. To the extent that the allegations are legal conclusions, no response is necessary. Criden & Love denies the remaining allegations.

43. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

44. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

45. Criden & Love admits that at the time of the filing of the Complaint, no action

was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

46. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

47. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

48. Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love denies the remaining allegations.

49. Criden & Love denies that Plaintiffs are entitled to any relief.


**Second Claim for Relief**
**(Declaratory and Injunctive**
**Relief: No Referral Fee)**

50. To the extent that Paragraph 50 includes allegations from previous paragraphs, Criden & Love incorporates its responses to those Paragraphs herein.

51. Criden & Love admits that a dispute currently exists as to whether Plaintiffs are obligated to pay Criden & Love a referral fee.

52. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

53. This paragraph includes arguments. To the extent that the paragraph can be read as

including factual allegations, Criden & Love denies same.

54. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

55. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

56. This paragraph includes arguments. Criden & Love admits that it never attempted to obtain Breen's consent to the Isaac Industries' referral to Saveri. To the extent that the paragraph can be read as including any other factual allegations, Criden & Love denies same.

57. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

58. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

59. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

60. Criden & Love states that Rule 19-301.5(e) speaks for itself.

61. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

62. Criden & Love denies the allegations in this paragraph.

63. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

64. This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

65. Criden & Love denies the allegations in this paragraph.

66.     Criden & Love admits that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs. Criden & Love further admits that it seeks a referral fee from Saveri regarding the $10 million he was paid in the TIO2 Action. Criden & Love denies the remaining allegations.

67.     This paragraph includes arguments. To the extent that the paragraph can be read as including factual allegations, Criden & Love denies same.

### Prayer for Relief

1.     Criden & Love denies that Plaintiffs are entitled to any relief.

2.     Criden & Love denies that Plaintiffs are entitled to any relief.

3.     Criden & Love denies that Plaintiffs are entitled to any relief.

4.     Criden & Love denies that Plaintiffs are entitled to any relief.

Criden & Love expressly denies each and every allegation of the Complaint not specifically admitted above. Criden & Love also requests that the Complaint be dismissed with prejudice, that Criden & Love be awarded its costs, and the Court order any further appropriate relief.

### AFFIRMATIVE DEFENSES

### First Affirmative Defense
(Failure to State a Claim)

Plaintiffs have failed to state a claim upon which relief can be granted.

### Second Affirmative Defense
(Venue)

This action cannot be brought in this judicial district under 28 U.S.C. § 1391(b)(2) or any other federal statute.

### Third Affirmative Defense
(Ripeness)

As to Plaintiffs' First Claim for Relief, the claim is not ripe given that at the time of the filing of the Complaint, no action was pending in any tribunal filed by Criden & Love against Plaintiffs.

### Fourth Affirmative Defense
(Standing)

As to Plaintiffs' First Claim for Relief, Plaintiffs do not have standing.

### Fifth Affirmative Defense
(Fraud)

Plaintiffs are barred from recovery under the doctrine of fraud. As detailed in Criden & Love's Counterclaim, Plaintiffs deceived Criden & Love into believing that Plaintiffs would pay Criden & Love a referral fee.

### Sixth Affirmative Defense
(Quantum Meruit)

Plaintiffs are barred from recovery under the doctrine of quantum meruit.

### Seventh Affirmative Defense
(Estoppel)

Plaintiffs are estopped from recovery because, among other things, Plaintiffs violated the "bad guy" exception to Rule 2-200 of the California Rules of Professional Conduct.

## COUNTERCLAIM

Defendant/Counter-Plaintiff Michael E. Criden, P.A. d/b/a Criden & Love, P.A. ("Criden & Love"), pursuant to Fed. R. Civ. P. 13(a), asserts its Counterclaim against Plaintiffs/Counter-Defendants Joseph Saveri Law Firm, Inc. and Joseph R. Saveri and alleges:

### Parties

1.      At all relevant times, Criden & Love was a Florida corporation with its principal place of business in South Miami, Florida.

2.      At all relevant times, the Joseph Saveri Law Firm, Inc. ("Saveri Law Firm") was a California corporation with its principal place of business in San Francisco. The Saveri Law Firm was founded in June 2012 by Joseph R. Saveri ("Saveri").

3.      Saveri is an individual residing in San Francisco, California. In 1992, Saveri joined Lieff Cabraser, where he founded and chaired the firm's Antitrust Practice Group. In June 2012, Saveri formed the Saveri Law Firm.

### Jurisdiction

4.      This Court has supplemental subject matter jurisdiction over this Counterclaim under 28 U.S.C. § 1367(a). The Court also has original subject matter jurisdiction over the Counterclaim under 28 U.S.C. § 1332 because the controversy is between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.      By filing an action in this Court, Counter-Defendants have waived any objection to personal jurisdiction with respect to any counterclaim.

6.     By filing an action in this Court, Counter-Defendants have waived any objection to venue with respect to any counterclaim.[1]

## GENERAL ALLEGATIONS

### Background on Antitrust Class Action Referrals

7.     Federal antitrust law grants standing only to those companies that purchase a price-fixed product *directly* from an antitrust defendant. Although there are several antitrust law firms around the country that have the resources to prosecute an antitrust class action, many of these firms do not have clients with standing who are willing to sue the defendant as a class representative.

8.     Moreover, law firms who prosecute antitrust class actions want to be appointed Lead Counsel. As Lead Counsel, a law firm not only decides how the case will be prosecuted, but it is given the authority to dole out work assignments. Getting as much work as possible in an antitrust class action is critical because each law firm's ultimate fee is based on how many hours that firm works on the case. Not surprisingly, Lead Counsel in antitrust class actions routinely keep the lion's share of the work for themselves. And, if the class recovery is large enough, their attorney fee can end up being a large multiple of their hours.

9.     Yet, even the best antitrust law firms cannot obtain a Lead Counsel position without a client.

10.    Criden & Love's law practice focuses on referring clients to larger antitrust law firms with the expectation that the law firm will become a Lead Counsel in an antitrust class

---

[1] Criden & Love expressly reserves its right to object to venue in connection with Plaintiffs' Complaint, as asserted in its Second Affirmative Defense.

action. In exchange for referring clients to these law firms, Criden & Love generally receives a

12.5% referral fee. Given how difficult it is to acquire an antitrust plaintiff, it is not uncommon

for Criden & Love to refer a single client to several firms, each of which pays Criden & Love a

referral fee. Criden & Love also generally performs work in the antitrust case for which it is

separately compensated.

## Genesis of the TIO2 Matter

11.     In July 2009, a Criden & Love client contacted Criden & Love regarding a

possible price fixing conspiracy in the titanium dioxide market. The client had been notified of

the matter by Gold Bennett Cera & Sidener, LLP ("Gold Bennett"), a California antitrust law

firm.

12.     Criden & Love brought the matter to Linda Nussbaum, an attorney in New York,

to investigate the allegations. Her analysis confirmed that it was likely that certain companies

had fixed the price of titanium dioxide.

13.     Criden & Love contacted another one of its clients, Isaac Industries, Inc., a

chemical wholesaler, to see whether it directly purchased titanium dioxide from any of the

potential defendants. Isaac Industries responded that it had purchased titanium dioxide directly

from one of the defendants and was willing to be a class representative.

14.     Nussbaum then contacted Saveri at Lieff Cabraser and Eric Cramer at Berger &

Montague, P.C. to see whether either of them were interested in pursuing the case. Both

responded that they would be interested, but neither had a client. Nussbaum told them that

Criden & Love already had a client who wanted to file the case.

15.     On February 7, 2010, Isaac Industries executed an engagement letter with Criden

& Love that stated that Isaac Industries was retaining Criden & Love, Lieff Cabraser and other firms to represent it as a class representative in the titanium dioxide matter.

### Lieff Cabraser Referral Agreement

16.     On February 8, 2010, Criden & Love sent Lieff Cabraser an e-mail with the following proposal for a referral agreement:

> Lieff Cabraser Heimann & Bernstein, LLP agrees to pay Criden & Love, P.A. a referral fee of 12.5% (Twelve and One Half Percent) of its fees, including any multiples on hours that it receives in this matter ("Total Fees"). Total Fees does not include any monies received for reimbursement of expenses. Lieff Cabraser agrees to pay the referral fee to Criden & Love even if Lieff Cabraser later procures another client in this matter. If Lieff Cabraser receives significantly less than its lodestar in the case, Criden & Love agrees to discuss in good faith reasonable accommodation to the amount of the referral fee.

17.     That same day, Eric Fastiff of Lieff Cabraser agreed to the Referral Agreement by reply e-mail.

18.     Saveri, who was Chairman of Lieff Cabraser's Antitrust Group at the time of filing, also agreed to the 12.5% referral.

### Berger & Montague Referral Agreement

19.     On February 9, 2010, in exchange for referring Isaac Industries to Berger & Montague, P.C. ("B&M") so that it could also participate in the TIO2 Class Action, B&M agreed to pay Criden & Love a 12.5% referral fee.

## Gold Bennett Files its Complaint

20.     Gold Bennett completed its own investigation of the titanium dioxide market and concluded that a price fixing had occurred.   Lieff Cabraser and Gold Bennett then agreed that they would file separate complaints with their respective clients in Baltimore, and then would seek to be appointed Lead Counsel.

21.     On February 9, 2010, Gold Bennett filed a complaint with its client Haley Paint Company styled: *Haley Paint Company v. Kronos Worldwide, Inc. et al.*, 10-cv-318 (D. Md.).

## Saveri and Lieff Cabraser File Their Complaint on Behalf of Isaac Industries

22.     On February 12, 2010, Lieff Cabraser filed a complaint with Isaac Industries as the plaintiff styled: *Isaac Industries, Inc. v. E.I. Dupont, et al.* 10-cv-323 (D. Md.).[2]  No other antitrust law firm filed a complaint in the TIO2 Action.

23.     Saveri is listed on the *Isaac* complaint as counsel for record for Isaac Industries.

## Saveri Files a Motion for Admission *Pro Hac Vice* on Behalf of Isaac Industries

24.     On February 17, 2010, Saveri filed a Motion for *Pro Hac Vice* "as counsel for Isaac Industries, Inc."

## Lieff Cabraser, with Isaac Industries as its Client, Obtains a Lead Counsel Position in the TIO2 Action

25.     On April 12, 2010, Lieff Cabraser and Gold Bennett filed a consolidated complaint with both plaintiffs. After a motion to dismiss filed by defendants was denied, Gold

---

[2] Hereinafter, the *Isaac* case and the *Haley* case, which were eventually consolidated, will be collectively referred to as the "TIO2 Action."

Bennett and Lieff Cabraser moved to memorialize their roles in the case. On April 1, 2011, the Court entered CMO No. 2, which appointed Lieff Cabraser and Gold Bennett as Lead Counsel.

26. While at Lieff Cabraser, Saveri worked approximately 28 months on the TIO2 Action in a "leadership role," with the "primary responsibility" at Lieff Cabraser for overseeing the case.

### Breen Intervenes in the TIO2 Action

27. On July 13, 2011, East Coast Colorants LLC d/b/a Breen Color Concentrates ("Breen") filed a motion to intervene in the TIO2 Action. On July 14, 2011, Vince Esades of Heins Mills & Olson, P.L.C. filed a Motion for *Pro Hac Vice* on behalf of Breen. On July 29, 2011, the Parties to the TIO2 Action entered into a Stipulation wherein Defendants consented to the intervention. Saveri signed the Stipulation on behalf of Isaac Industries. Esades signed it on behalf of Breen. The Court approved the Stipulation on July 29th.

### The May 2012 Telephone Conversation Between Kevin Love and Joseph Saveri

28. In May 2012, Joseph Saveri initiated a telephone call with Kevin Love ("Love") of Criden & Love. In that conversation, Saveri informed Love that he was leaving Lieff Cabraser to start his own law firm and that he intended to file a motion to be appointed Lead Counsel in the TIO2 Action while representing Isaac Industries. Love responded that if Saveri moved for Lead Counsel while representing Isaac Industries, Criden & Love would expect him to pay Criden & Love a 12.5% referral fee.

29. It was important to Saveri to remain in the case as a Lead Counsel. Specifically, Saveri told Love he wanted to continue the same structure: "A co-lead structure with Gold

Bennett as one lead, Lieff Cabraser, me, as the other . . . and I wanted to continue that in the future." In fact, Saveri did not consider his switching firms as actually ever leaving the TIO2 Action: "Well, I don't know[,] as I would [not] characterize it as coming back in because I don't think I ever left."

### Saveri Leaves Lieff Cabraser to Start His Own Law Firm

30. On or about June 1, 2012, Saveri left Lieff Cabraser and started his own law firm called the Joseph Saveri Law Firm.

### Multiple Notices of Appearances for Breen

31. Between July 2011 (when Breen intervened in the case) and June 1, 2012 (when Saveri started his new law firm), no less than five lawyers from three separate law firms filed notice of appearances for Breen in the TIO2 Action.

### Saveri Files a Notice of Appearance for Breen

32. Even though Saveri already represented Isaac Industries, and even though Breen had at least five other lawyers representing it, Saveri filed a Notice of Appearance on behalf of Breen on June 1, 2012.

### Rule 101 of the Local Rules for the U.S. District Court for the District of Maryland

33. Local Rule 101 requires any attorney who wants to withdraw their appearance for a corporate party to seek leave of court. At least eight attorneys and/or their law firms followed this rule in the TIO2 Action and sought leave of court to withdraw their appearances.

Saveri was not one of them.

**Saveri Chooses *Not* to File a Notice of Withdrawal of His
Representation of Isaac Industries Because It Wouldn't Be "Prudent"**

34.     When Saveri filed his Notice of Appearance on behalf of Breen, he did not file a
motion to withdraw from his representation of Isaac Industries.  In fact, Saveri ***never*** filed a
notice of withdrawal of his appearance on behalf of Isaac Industries.  When asked at deposition
why he didn't file one, Saveri responded that he simply didn't think it would be "prudent."

35.     Consequently, Saveri and the Saveri Law Firm never stopped being counsel of
record for Isaac Industries in the TIO2 Action.

**Lawyers from the Saveri Law Firm Begin to File Appearances for Isaac Industries**

36.     On June 29, 2012, about a month after Saveri's Notice of Appearance for Breen,
Kevin Rayhill, a lawyer with the Saveri Law Firm, signed and filed a Motion for *Pro Hac Vice*
on behalf of Isaac Industries, as well as the other two plaintiffs.

37.     On July 25, 2012, about two months after Saveri's Notice of Appearance for
Breen, Lisa Leebove, a lawyer with the Saveri Law Firm, signed and filed a Motion for *Pro
Hac Vice* on behalf of all "Plaintiffs," which included Isaac Industries.

38.     These two appearances, filed by Saveri's lawyers on behalf of Isaac Industries
before Saveri filed his August 2012 motion to be added as Lead Counsel, can be contrasted
with the April 2013 appearance of Ryan McEwan, another Saveri lawyer, whose appearance
was *solely* on behalf of Breen (which occurred *after* Saveri filed his motion to be added as Lead
Counsel).

### The June 2012 Telephone Conversation
### Between Kevin Love and Joseph Saveri

39. In June 2012 (the same month that Saveri filed his Notice of Appearance on behalf of Breen), Saveri emailed Love and even spoke with Love on the phone, but at no time during these conversations did Saveri mention that his Notice of Appearance for Breen was intended to reject Love's referral offer.

### While Representing Isaac Industries,
### Saveri Moves To Become Lead Counsel

40. On August 7, 2012, Saveri accepted Love's referral offer.

41. Consistent with the terms of the offer made by Love to Saveri in their May 2012 conversation, Saveri filed a motion to add his new law firm as a Lead Counsel *while representing Isaac Industries.*

42. In fact, in his motion, he represents to the Court that Isaac Industries and its counsel of record (Criden & Love) supports his motion:

> Named Plaintiffs Haley Paint Company, *Isaac Industries, Inc.* and East Coast Colorants LLC ("Plaintiffs"), *by and through their counsel of record,* hereby move the Court for an order amended Case Management Order No. 2 . . . to include the Joseph Saveri Law Firm as one of Plaintiffs' Interim Co-Lead Class Counsel. (emphasis added).

43. Likewise, in his Memorandum in Support of the Motion, Saveri again represents to the Court that Criden & Love "supports" his Motion.

> *All Plaintiffs' counsel of record here support* the present request that the Joseph Saveri Law Firm be included with Lieff Cabraser and [Gold Bennett] as Interim Co-Lead Class Counsel. (emphasis added).

44. Criden & Love was counsel of record when Saveri filed his motion.

45. When asked later at deposition how he secured Criden & Love's approval for the

Motion, Saveri responded:

> **Well, look, I – I believed frankly that . . .** *there was no reason to believe that anybody would not support my motion, particularly if the issue was on the payment of a – of a referral fee.*

46. Saveri knew that Criden & Love would support his request to become a Lead Counsel while still representing Isaac Industries *only if* he agreed to pay Criden & Love a 12.5% referral fee.

47. Therefore, Criden & Love reasonably interpreted and understood Saveri's conduct in moving for Lead Counsel, along with his representations to the Court, as acceptance of Criden & Love's referral offer.

48. Had Saveri told Criden & Love that he was rejecting its referral offer *before* he filed his motion for Lead Counsel, Criden & Love would have told Saveri that it would oppose Saveri's motion, and, if necessary, would have filed a notice of its opposition with the Court.

### Filing A Notice of Appearance On Behalf Of Breen Had Nothing To Do With Saveri Becoming A Lead Counsel

49. Saveri did not rely on his Notice of Appearance for Breen in his Motion for Lead Counsel. Likewise, the Notice was irrelevant to the decision by Lieff Cabraser and Gold Bennett to support Saveri's request to become a Lead Counsel.

### Criden & Love's Practice of Sending Out Reminder E-Mails

50. Given that antitrust class actions can take several years to resolve, it is Criden & Love's practice to send out e-mails to remind firms of their referral obligations. These reminder e-mails usually include a request to confirm the obligation. In most cases, lawyers do

not bother responding to the e-mails even though every law firm (before Saveri) has honored their referral obligations.

51.     For example, in the TIO2 case itself, Criden & Love sent out a reminder e-mail to B&M, which included a request for confirmation by B&M of its referral obligation.

52.     B&M never responded to the email.

53.     But unlike Saveri, B&M honored its 12.5% referral obligation to Criden & Love.


### Saveri's First Reminder E-Mail

54.     Love first sent Saveri an e-mail on August 8, 2012, congratulating him on his imminent promotion to Lead Counsel and reminding him of his 12.5% referral fee. Saveri did *not* send Love a response informing Love that Saveri did not intend to pay Criden & Love a referral fee.


### The TIO2 Action Settles and Saveri Receives a $10 Million Fee

55.     Between July 2013 and September 2013, plaintiffs in the underlying TIO2 Action settled with each of the defendants in that case.   In total, the case settled for $163,500,000.  The Court awarded $54.5 million in attorneys' fees.

56.     To support his fee request, Saveri represented to the Court that he had worked "intensively on the case since its inception" as the Chair of the Antitrust Practice Group at Lieff Cabraser, which had been appointed Lead Counsel. Saveri then stated that, since his new law firm was appointed Lead Counsel: "I have *continued my leadership position* in the case, exercising day-to-day management and supervision over the litigation."

### Saveri's Second Reminder E-Mail

57. In October 2013, Criden & Love sent another e-mail to Saveri to congratulate him on the outcome, and also to remind him of his referral obligation. Again, Saveri did *not* respond.

### In 2014, Saveri Finally Informs Criden & Love That He Does *Not* Intend to Honor His Referral Obligation

58. In early 2014, Saveri and Love again spoke on the phone. At this point, Saveri had received his $10 million fee. Love asked Saveri when he planned to pay Criden & Love its 12.5% referral fee. It was at this point that Saveri finally revealed to Love that he did not intend to pay Criden & Love a referral fee of any kind – a fact that he had not previously shared with Criden & Love, despite Criden & Love's numerous emails to Saveri raising the issue. Saveri also told Love that he didn't owe Criden & Love a referral fee because he had "rejected" their offer by filing a Notice of Appearance on behalf of Breen in June 2012.

59. Despite his "rejection," Saveri nevertheless told Love he was would send Criden & Love "a proposal" by the close of the next day. Saveri, however, never sent Criden & Love a proposal because, according to Saveri, he had decided that Criden & Love had already received enough fees, i.e., the referral fees from Lieff Cabraser and Berger & Montague and the payment for the hours it put into the case.

60. Saveri admitted at deposition, however, that it is not unusual for referring firms to also work on antitrust cases and be paid for that work. It is also not unusual for firms to receive more than one referral fee in a single case.

### Isaac Industries' Notice and Consent Letter

61.     On July 28, 2014, David Avan, President of Isaac Industries, executed a Notice and Assent Letter, agreeing to Saveri paying a 12.5% referral fee to Criden & Love.

### Final Distribution to Class Members

62.     The TIO2 Action came to an end in October 2014 with the final distribution to Class Members.

### Criden & Love's Recovery

63.     Criden & Love was paid a fee, based on its lodestar, for the work it performed in the case.

### Lieff Cabraser Pays Criden & Love a Referral Fee

64.     Lieff Cabraser paid Criden & Love 12.5% of its recovery for the Isaac Industries referral.

### Berger & Montague Pays Criden & Love a Referral Fee

65.     Berger & Montague paid Criden & Love 12.5% of its recovery for the Isaac Industries referral.

### Saveri Refuses to Pay Criden & Love a Referral Fee

66.     Saveri, however, who would have never even been in the TIO2 case without Isaac Industries, and who would have never become Lead Counsel without Isaac Industries,

refused to pay Criden & Love one dollar in referral fees on the $10 million he received in the TIO2 Action. Nor, for that matter, has Saveri paid anyone else a referral fee on his $10 million fee.

### Criden & Love Files an Arbitration Claim in Miami Against Saveri

67. After Saveri refused to pay his referral fee, Criden & Love filed an arbitration claim against Saveri and the Saveri Law Firm in Miami under an equitable estoppel theory.

### Saveri Files a Case in Federal Court in California

68. Saveri responded by filing an action in the United States District Court for the Northern District of California (Case No. 14-1740) to stop the arbitration and for a declaration that no referral fee contract existed between the parties. The parties ultimately consented to proceed before a magistrate judge in that case.

### The California Court Holds That It Can Exercise Jurisdiction Over Criden & Love

69. On July 23, 2014, Magistrate Judge Elizabeth D. Laporte denied Criden & Love's motion to dismiss for lack of personal jurisdiction, holding, among other things, that Saveri's claims did not arise out of a contractual relationship because they "sound in equity" and equitable claims sound in tort.

### The California Court Grants Summary Judgment on all Claims

70. The Magistrate Judge then granted Saveri's motion for summary judgment, holding, among other things, that Saveri's Notice of Appearance for Breen could not be

reasonably interpreted, as a matter of law, as anything other than a rejection of Criden & Love's referral offer (even though Saveri never withdrew his appearance for Isaac Industries). Criden & Love timely appealed the Judgment (which included both the personal jurisdiction and summary judgment orders).

### The Ninth Circuit Reverses

71.    On June 2, 2017, the Ninth Circuit entered an opinion reversing the Judgment, holding that Ninth Circuit law clearly holds that any claim related to the existence of a contract sounds in contract, not tort (whether or not those claims are equitable in nature). Having found the Magistrate Judge erred by finding personal jurisdiction over Criden & Love, the Ninth Circuit never had the opportunity to reach the judge's decision on summary judgment.

### CAUSES OF ACTION

### COUNT I
### (Contract Implied in Fact)

72.    Criden & Love realleges the allegations of paragraphs 1 through 71 as if set forth herein in full.

73.    In May 2012, Saveri notified Love that he was leaving Lieff Cabraser to start his own law firm and that he intended to file a motion to be appointed Lead Counsel in the TIO2 Action while representing Isaac Industries. Love responded that if Saveri moved for Lead Counsel while representing Isaac Industries, Criden & Love would expect him to pay Criden & Love a 12.5% referral fee.

74.    On August 7, 2012, Saveri accepted Love's referral offer.   On that day,

consistent with the terms of the offer made by Love to Saveri in their May 2012 conversation, Saveri filed a motion to add his new law firm as a Lead Counsel while representing Isaac Industries.

75. Saveri's act of filing the motion while representing Isaac Industries was an intentional act, and Saveri knew, or had reason to know, that Criden & Love would reasonably interpret his actions as an agreement to pay Criden & Love a 12.5% referral fee.

76. Criden & Love reasonably interpreted and understood Saveri's conduct in moving for Lead Counsel while representing Isaac Industries, along with his other representations to the Court, as acceptance of Criden & Love's referral offer.

77. Saveri's conduct created an implied-in-fact contract between Criden & Love on the one hand and Saveri and his new law firm on the other.

78. Saveri and the Saveri Law Firm have breached the contract by refusing to pay Criden & Love a 12.5% referral fee on their $10 million recovery in the TIO2 Action.

79. Saveri and the Saveri Law Firm have caused Criden & Love to suffer damages.


### COUNT II
### (Money Had and Received)

80. Criden & Love realleges the allegations of paragraphs 1 through 71 as if set forth herein in full.

81. Had Criden & Love not initially referred Isaac Industries to Saveri and Lieff Cabraser to file a complaint in the TIO2 Action, Saveri and the Saveri Law Firm would never have received $10 million in attorney fees in the TIO2 Action.

82. Likewise, had Saveri stayed at Lieff Cabraser, Criden & Love would have

received 12.5% of any fees received by Lieff Cabraser due to the work performed by Saveri.

83.     Saveri and the Saveri Law Firm have refused to pay Criden & Love a 12.5% referral fee on the $10 million Saveri received in the TIO2 Action.

84.     In equity and good conscience, 12.5% of Saveri's fee award should be paid to Criden & Love.

85.     Saveri and the Saveri Law Firm have therefore become indebted to Criden & Love for 12.5% of the attorney fees they received in the TIO2 Action.

86.     It would work an injustice if Saveri and the Saveri Law Firm were permitted to keep the $10 million fee award without paying Criden & Love a 12.5% referral fee.

87.     As a direct result of Saveri and the Saveri Law Firm's refusal to pay Criden & Love a 12.5% referral fee, Criden & Love has suffered damages.

## COUNT III
### (Unjust Enrichment/Restitution)

88.     Criden & Love realleges the allegations of paragraphs 1 through 71 as if set forth herein in full.

89.     It would be unjust for Saveri and the Saveri Law Firm to retain Criden & Love's referral fee.

90.     Criden & Love referred Isaac Industries to Saveri and Lieff Cabraser in the TIO2 Action.

91.     Saveri, on behalf of Isaac Industries, filed a complaint in the TIO2 Action.

92.     Saveri, as Chair of Lieff Cabraser's Antitrust Department, functioned as the senior lawyer with "primary responsibility" for prosecuting the TIO2 action for 28 months. It was during those 28 months that Saveri began his "leadership role" in the TIO2 Action.

93.    In or about June 2012, Saveri left Lieff Cabraser to start a new firm.

94.    Saveri then filed a Notice of Appearance on behalf of Breen.

95.    After the Notice of Appearance for Breen was filed, Saveri moved to be appointed Lead Counsel. But Saveri did not represent to the Court that he deserved to be Lead Counsel because he filed a Notice of Appearance for Breen. Nor did the appearance for Breen have anything to do with Saveri being appointed Lead Counsel.

96.    Instead, Saveri's motion was based on the fact that, for the past 28 months, he had been the lawyer at Lieff Cabraser with "primary responsibility" for prosecuting the TIO2 action, and that he wanted to continue his "leadership role."

97.    Had Criden & Love not referred Isaac Industries to Saveri and Lieff Cabraser, Saveri would have never had a "leadership role" in the TIO2 case prior to him seeking a Lead Counsel appointment for his new law firm.

98.    Therefore, it was only because Criden & Love referred Isaac Industries to Saveri in 2010 that Saveri was able to become a Lead Counsel in 2012, generate a $3.77 million lodestar, receive a 2.61 multiplier and be paid over $10 million in fees.

99.    Saveri and the Saveri Law Firm were not given the opportunity to work as a Lead Class Counsel in the TIO2 Action because they filed a Notice of Appearance for Breen.

100.    Saveri has refused to pay Criden & Love a referral fee even though Saveri would have never recovered $10 million had Criden & Love not referred Isaac Industries to him and Lieff Cabraser.

101.    Saveri and the Saveri Law Firm have received a benefit – a $10 million attorney fee.

102. Under the circumstances described above, to allow Saveri and the Saveri Law Firm to keep the $10 million attorney fee without paying Criden & Love a referral fee would be unjust and inequitable at the expense of Criden & Love.

### COUNT IV
### (Quantum Meruit)

103. Criden & Love realleges the allegations of paragraphs 1 through 71 as if set forth herein in full.

104. Criden & Love conferred a benefit on Saveri and the Saveri Law Firm that they have unjustly retained.

105. The proper measure for Quantum Meruit in this case is how much of a benefit Criden & Love's referral conferred on Saveri and the Saveri Law Firm.

106. The proper amount of damages can be established by referring to the customs of the industry to determine the value of Criden & Love's referral.

### COUNT V
### (Fraud - Concealment)

107. Criden & Love realleges the allegations of paragraphs 1 through 71 as if set forth herein in full.

108. After the May 2012 conversation between Saveri and Love, Saveri moved for Lead Counsel while representing Isaac Industries, but concealed from Criden & Love the fact that he did not intend to pay Criden & Love a referral fee.

109. As part of the scheme, Saveri never withdrew his appearance for Isaac Industries.

110. As part of the scheme, lawyers at the Saveri Law Firm filed appearances for Isaac Industries.

111. As part of the scheme, Saveri filed a motion for Lead Counsel with representations that Isaac Industries and Criden & Love supported the motion.

112. Saveri made these disclosures and representations while concealing from Criden & Love the fact that he did not intend to pay Criden & Love a referral fee that rendered his disclosures and representations likely to mislead. The conduct, failure to act, concealment, disclosures, failures to disclose and representations of Saveri and the Saveri Law Firm, including but not limited to never withdrawing Saveri's appearance as counsel of record for Isaac Industries and moving to be appointed as Lead Counsel while he was counsel for Isaac Industries, was intentional and intended to induce Criden & Love to not oppose that motion and to ensure that Criden & Love did not raise the referral fee issue to the Court at the time counsel petitioned the Court for the award of attorneys' fees.

113. Saveri intended to deceive Criden & Love by concealing the fact that he did not intend to pay Criden & Love a referral fee.

114. Criden & Love did not know that Saveri did not intend to pay Criden & Love a referral fee and would have acted differently had it known. For example, Criden & Love would have told Saveri not to represent to the Court that Isaac Industries and Criden & Love support his motion for Lead Counsel. Criden & Love would have informed Saveri that if they could not resolve the issue amicably without Court intervention, Criden & Love would raise the issue with the Court. Faced with Court intervention, and the prospect of not being appointed Lead Counsel, Saveri would have agreed to paying the referral fee.

115. Saveri's concealment of the fact that he never intended to pay Criden & Love a

referral fee has therefore caused Criden & Love to suffer damages, i.e., the loss of its referral fee.

## PUNITIVE DAMAGES

116. After he left Lieff Cabraser to start his new law firm, Saveri purposefully embarked on an unlawful scheme to avoid his obligation of paying a referral fee to Criden & Love even though it was Criden & Love's client that made it possible for Saveri to recover $10 million in the TIO2 case.

117. Saveri purposefully kept Criden & Love in the dark about his ultimate plan not to pay a referral fee until after the Court in the TIO2 Action had awarded fees so that the issue could not be timely raised in the TIO2 Action.

118. Saveri's fraudulent conduct shows an extreme indifference to Criden & Love's rights, intending to cause injury to Criden & Love.

119. Saveri's unlawful, reprehensible, fraudulent conduct warrants punitive damages in an amount no less than three times the amount of Criden & Love's referral fee, or 37.5% of his recovery in the TIO2 Action.

## PRAYER FOR RELIEF

**WHEREFORE**, Criden & Love demands the following relief:

(A) actual, incidental and consequential damages;

(B) restitution and disgorgement;

(C) quantum meruit;

(D) punitive damages;

34

(E) costs, pre-judgment interest, post-judgment interest; and

(F) such other further relief as this Court deems appropriate.

## Demand for Jury Trial

Criden & Love demands a trial by jury on all issues so triable.

Dated: July 19, 2017

Respectfully submitted,

*/s/ Scott H. Phillips*
Scott H. Phillips, #013244
**Semmes, Bowen & Semmes**
25 South Charles Street, Suite 1400
Baltimore, Maryland 21201
(410) 539-5040
sphillips@semmes.com

Curtis Jay Mase (Florida Bar No. 478083)
cmase@masetinelli.com
(*pro hac vice* motion forthcoming)
Cameron Eubanks (Florida Bar No. 85865)
ceubanks@masstinelli.com
(*pro hac vice* motion forthcoming)
**Mase, Tinelli, Mebane & Briggs, P.A.**
2601 Bayshore Drive, #800
Miami, FL 33133
Telephone: 305-377-3770

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th day of July, 2017 a copy of the foregoing was filed electronically with the Court and served electronically on all counsel of record.

/s/ Scott H. Phillips
Scott H. Phillips